## Smith v Gold et al.

*Daniel F. Metzman,* for plaintiff.

*Blanc, Steinberg, Balder & Steinbrook,* for defendants.

LEWIS, P. J., March 25, 1955.—Plaintiff, William F. Smith, filed this complaint in equity seeking to compel defendants, William Gold and Gerald Gold, indi-

vidually and trading as the Gold Rental Company, to reform a certain lease agreement for a 1952 Hudson automobile into a lease purchase agreement and to specifically perform the agreement as reformed. Plaintiff alleges that he executed the lease agreement in reliance on defendants' fraudulent representations. Plaintiff also seeks relief from the payment of certain sums of money due under the agreement, alleging that they are in violation of the Motor Vehicle Sales Finance Act.

Defendants answered, alleging that the agreement between the parties is a mere lease; they also demand possession of the automobile and damages for its retention.

Defendants offer the lease agreement, admittedly signed by plaintiff, asserting that it contains the whole agreement of the parties and that the parol evidence rule precludes the consideration of any evidence altering or varying the written agreement.

We do not agree with this contention. It is true that parol evidence is not admissible to vary or alter the terms of a complete written integrated agreement. However, we do not believe the rule has any application, to the facts of this case, inasmuch as the agreement, under the provisions of the Motor Vehicle Sales Finance Act, is incomplete on its face. The law is well settled in Pennsylvania that, if a writing purporting to contain the whole agreement between parties shows on its face that it is not complete, parol evidence is admissible to prove the whole transaction: Frederick Estate, 156 Pa. Superior Ct. 547, 554 (1944) ; Ruck v. Vassalotti, 152 Pa. Superior Ct. 188, 191 (1943).

The Act of June 28, 1947, P. L. 1110 et seq., 69 PS §601 et seq., known as the Motor Vehicle Sales Finance Act, provides in paragraph 10 of the definition section that the term "installment sale contract" shall mean . . . "any hire-purchase agreement or any contract for the bailment or leasing of a motor vehicle under which

the hire purchaser, the bailee or lessee contracts to pay as compensation a sum substantially equivalent to or in excess of the value of the motor vehicle and any other form of contract which has a similar purpose or effect."

In the agreement before us plaintiff has contracted to make 156 payments of $17.98, or a total of $2,204.88. Defendant William Gold admits that in addition to the above sum plaintiff was allowed a credit of $646, as a "trade-in" allowance on his older automobile. Defendant further admits that the price of a 1952 Hudson automobile of the model here involved at the time of the transaction was $2,542. It is thus manifest that the agreement before us calls for the payment of a "sum substantially equivalent to or in excess of the value of a motor vehicle". Hence, the agreement, regardless of what the parties choose to call it, is an "installment sales contract" within the meaning of the above quoted act. Whatever doubts there may be as to the propriety of including the amount of the "trade-in allowance", in order to constitute a contract calling for the payment of a sum equivalent to the value of the motor vehicle, and thus bring it within the statutory definition, are without consequence in view of the further language of the statute, "any other form of contract which has a similar purpose or effect", which language beyond doubt includes within its scope the agreement before us.

Our interpretation of this statutory language in no wise indicates that we believe the legislature intended by the use of such broad language to convert every motor vehicle lease into an installment sales contract, but it is apparent that the legislature viewed with suspicion any agreement, lease or otherwise, which calls for the payment of a sum substantially equivalent to the value of a motor vehicle (see findings and declarations of policy of Motor Vehicle Sales Finance Act) and, hence, has laid down certain safeguards

applicable to such contracts. If the evidence establishes that the parties in reality intended only a lease then, of course, the sale requirements of the act are inoperative.

Section 14 of the Motor Vehicle Sales Finance Act sets forth certain requirements which must be included in an installment sale contract, among which are the following:

"B. Every installment sale contract shall set forth the following separate items as such and in the following order:

"1. Cash price of the motor vehicle. This amount may include any taxes, charges for delivery, cost of servicing, repairing or improving the motor vehicle, costs of accessories and installation or other costs normally included in the delivered cash price of such motor vehicle.

"2. Down payment made by the buyer at the time of or prior to execution of the contract, indicating whether made in cash, or represented by the agreed value of a 'trade-in' motor vehicle, or other goods, or both. The amount of cash and/or the value of any 'trade-in' shall be shown separately. A description of the 'trade-in', if any, sufficient for the identification shall be shown.

"3. Unpaid cash price balance which shall be the difference between the cash price (Item 1) and the down payment (Item 2) above.

"4. Insurance premium costs for the payment of which the seller agrees to extend credit to the buyer. The term of such insurance, a concise description of the coverage and the amount of the premium shall be set forth. If the precise cost of the insurance is not available at the time the contract is signed, an estimated amount, ascertained from a chart prepared by the licensee and approved by the administrator, may be set forth in the contract. When the cost of the in-

surance is so estimated, the contract shall so state and it shall contain notice to the buyer that the difference between the estimated cost and the actual cost of the insurance, including finance charges on such amount, will be adjusted at the time of the final payment on the contract, and a statement of the amount of the adjustment shall be furnished to the buyer simultaneously with the delivery of the insurance policy or certificate.

"5. Other costs, necessary or incidental, which the seller contracts to pay on behalf of the buyer and for the amount of which the seller agrees to extend credit to the buyer as authorized by this act. Such costs shall be itemized in the contract as to nature and amount.

"6. Principal amount financed which shall be the total of the unpaid cash price balance (Item 3) plus the insurance premium costs (Item 4) plus other costs (Item 5) for which the seller agrees to extend credit to the buyer.

"7. Finance charge which is the consideration in excess of the cash price (Item 1), excluding insurance premium (Item 4) and other costs (Item 5), which the buyer agrees to pay to the seller for the privilege of purchasing the motor vehicle under the installment sale contract.

"8. Time balance which shall be the total of the principal amount financed (Item 6) plus the finance charge (Item 7) and which shall represent the total obligation of the buyer which he agrees to pay in two or more scheduled payments.

"9. Payment schedule which shall state the number of payments, the amount of the payments and the time of the payments required to liquidate the time balance.

. . .

"D. Every installment sale contract shall contain a summary notice of the buyer's principal legal rights respecting prepayment of the contract and rebate of

finance charge and reinstatement of the contract in the event of repossession."

The agreement before us does not contain any of the above requirements and, hence, as an "installment sales contract" is incomplete on its face. We may, therefore, consider evidence of the whole transaction.

From this evidence we have found as facts that William F. Smith, relying on defendants' advertisement in the name of the Roxy Automobile Company, went to defendants' place of business, and there engaged in a course of conduct with defendants which can only be interpreted as bargaining for the purchase of a new 1952 Hudson automobile.

Plaintiff, upon his arrival at defendants' place of business, informed defendants' agent Mr. Fingerhut of the purpose of his visit, to purchase a new automobile. With that purpose in mind, the agent examined plaintiff's older 1949 automobile and informed him that they would give him a trade-in allowance of $1,495, later reduced to $1,295 by William Gold, defendant herein, on the purchase of a new automobile. Plaintiff's wife meanwhile selected the automobile which she desired, and the price of $2,480 was agreed on by the parties. Upon his return one week later plaintiff was presented with "the figures", that is he was told that he was to pay $17.98 per week for 156 weeks, at the end of which time the automobile would belong to him. Whereupon plaintiff signed the agreement now before us. This agreement, being a mere lease, does not contain any provision for a subsequent transfer of title. Plaintiff testified that he did not read the agreement, but merely glanced over it, relying entirely, and we find reasonably, on defendants and defendants' agent's representation that a sale was being effected and that this was the proper method to accomplish it. It must be noted that at the time of this transaction Federal Reserve Regulation "W" restricted time purchases to

18 months, and that such regulation would have required plaintiff, in paying for this automobile, to make payments in excess of $150 per month in order to amortize the outstanding cost of the automobile within the period required by the regulation. This would have been difficult for a man of plaintiff's means, hence, it may well be that defendants' use of the lease form in these circumstances was motivated by a desire to circumvent the regulation rather than to defraud plaintiff.

A few days later plaintiff returned to defendants' agency to accept delivery of the new automobile. When he commenced to remove his automobile registration plates from the older car, he was informed by Mr. Fingerhut that such transfer was not necessary, as the new automobile was registered in the name of the Gold Rental Company, because, "you won't be able to carry the full note now, but when the payments are down, we will refinance it once again in your name, and title will be in your name".

Relying on this statement, plaintiff made payments under the agreement for approximately two years; however, when defendant refused to honor his request that title be transferred to him, plaintiff became suspicious and consulted his attorney, who filed the present bill.

The facts establish that the agreement as consummated by the parties provided for a subsequent transfer of title to the automobile to plaintiff when the outstanding balance was within the permissive credit range. Ordinarily, one does not relinquish ownership rights in an automobile merely for the privilege of driving a newer automobile without hope of ever owning it. Such an agreement is not only within the statutory definition of an "installment sales contract" as pointed out, supra, but, indeed, is the sale of a motor vehicle—the very transaction which the legislature had in mind when it enacted the Motor Vehicle Sales Finance Act,

—hence, its provisions are fully applicable to the contract before us.

The act provides that an installment seller of motor vehicles, which we find defendants to be in this transaction, must procure a license before engaging in the business of installment automobile sales. It is admitted by defendants that the Gold Rental Company was not so licensed at the time of this transaction. The Motor Vehicle Sales Finance Act provides further in section 35 A:

"No obligation of the buyer of a motor vehicle under an installment sale contract which was consummated within the Commonwealth of Pennsylvania shall be enforcible in the Commonwealth of Pennsylvania, wherein the seller was not licensed, as required under the provisions of this act, at the time such seller entered into such installment sale contract, or wherein the holder was not licensed under the provisions of this act, at the time he acquired such contract. The buyer under such contract shall be entitled to cancellation of the contract, release of all liens against the motor vehicle sold under such contract and against any collateral security owned by the buyer or his sureties and guarantors, upon payment or tender of payment to the holder of the principal amount financed as set forth in the contract, less all payments on account of such obligation exclusive of down payment which had been made prior thereto."

Pursuant to the above section of the act, plaintiff William F. Smith is entitled to an immediate cancellation of the contract entered into with the Gold Rental Company, and to a release of all liens against the motor vehicle upon payment or tender of payment to the holder of the principal amount financed less all payments on account of such obligations, exclusive of the down payment which had been made prior hereto.

The principal amount financed is defined in the act as:

" 'Principal amount financed' shall mean the unpaid cash price balance after deducting the down payment, adding the cost of any insurance premiums required or obtained as security for or by reason of the sale of a motor vehicle under an installment sale contract, and adding other costs necessary or incidental to the sale of the motor vehicle under such contract, which the seller contracts to pay on behalf of the buyer, and for the amount of which the seller agrees to extend credit to the buyer, and for which the buyer contracts voluntarily."

From the evidence before us we have found that the principal amount financed is $2,321.06, consisting of $2,480, cost of automobile minus $646 trade-in or down payment, plus $133 cost of insurance actually expended, plus $354.06 financing charge, six percent interest discounted for three years on the sum actually outstanding, $1,967.

We have likewise found that plaintiff has to date made payments on account of the obligation incurred by this contract in the amount of $2,025, and that the outstanding balance totals $296.06.

It is true that in ordinary circumstances the failure to perform a condition precedent of payment or tender may preclude a court of equity from granting relief; however, here defendants' violation of the Motor Vehicle Sales Finance Act was the cause of the delinquency of plaintiff and, hence, is unavailing to defendants. Indeed, there is much in the defendants' behavior which would support an inference of fraud, which if properly proven is an independent ground permitting a chancellor to void or alter the terms of a written agreement by oral evidence. Whether the evidence of fraud in the case is such we do not decide, believing that the Motor Vehicle Sales Finance Act was intended by the legislature to obviate the difficulty of proving fraud in this type of transaction.

*Conclusions of Law*

1. The contract entered into on January 20, 1952, between William F. Smith and the Gold Rental Company was an installment sale contract, within the meaning of the Motor Vehicle Sales Finance Act, 69 PS §603 et seq., for the retail sale of a motor vehicle, under which the price was payable in two or more scheduled payments subsequent to the making of such contract and under which William F. Smith contracted to pay as compensation for the motor vehicle a sum in excess of the value of the motor vehicle.

2. The Gold Rental Company charged William F. Smith $501 for interest on the 1952 Hudson automobile, which is an illegal charge under the Motor Vehicle Sales Finance Act.

3. The Gold Rental Company charged William F. Smith the sum of $180 as a rental fee on the 1952 Hudson, which was also an illegal charge under the Motor Vehicle Sales Finance Act.

4. The Gold Rental Company charged William F. Smith the sum of $55 as a delinquent charge on the 1952 Hudson, which charge is likewise an illegal charge under the act.

5. The contract entered into between William F. Smith and the Gold Rental Company, an unlicensed seller under the requirements of the Motor Vehicle Sales Finance Act, is unenforceable against the buyer, William F. Smith, within the Commonwealth of Pennsylvania: 69 PS §635.

6. William F. Smith, the buyer under the contract, is entitled to cancellation thereof, and to a release of all liens against the motor vehicle sold, upon payment or tender of payment to the holder of the principal amount financed as set forth in the contract, less all payments on account of such obligation exclusive of the down payment.

*Final Decree*

And now, to wit, this 27th day of May, 1955, this case having come to be heard upon complaint, answer and proofs, and upon exceptions to the adjudication and to the Decree Nisi entered on the 25th day of March, 1955; upon consideration thereof it is ordered, adjudged and decreed:

1. That the defendants, Gold Rental Company, William Gold and Gerald Gold shall within 10 days transfer a free and unencumbered title to a certain 1952 Hudson Automobile bearing Serial No. 4B141496 to William F. Smith, plaintiff, and deliver to Smith the title certificate.

2. That defendants, Gold Rental Company, William Gold and Gerald Gold, pay over to plaintiff William F. Smith, within ten days the sum of Fifty-eight Dollars ($58.00) in money.

3. That defendants pay the costs herein.